UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| **EFRAIN ROMERO-GARCIA**, as father and statutory next-of-kin of Efrain Romero de la Rosa; <br><br> *Plaintiff*, <br><br> v. <br><br> **CORECIVIC, INC.**, <br><br> *Defendant*, | Civil Action No.: _____ <br><br> Related Case No. 4:19-cv-81-CDL |

### Introduction

1. This is a wrongful death action for compensatory and punitive damages arising out of the preventable suicide inside a solitary confinement cell at the Stewart Detention Center by Efrain Romero de la Rosa, a 38 year-old longtime U.S. resident who suffered from acute schizophrenia.

### Parties

2. Plaintiff Efrain Romero-Garcia ("Plaintiff") is an adult resident of Mexico. He is the father and next-of-kin of Efrain Romero de la Rosa, who died with no surviving spouse or children.

3. Defendant CoreCivic, Inc. ("CoreCivic" or "Defendant") is a publicly-traded Real Estate Investment Trust incorporated under the laws of the State of Maryland and headquartered just outside Nashville, Tennessee.

4. At all times relevant to this Complaint, Defendant owned and operated the Stewart Detention Center in Lumpkin, Georgia pursuant to a pass-through Inter-Governmental Services Agreement between U.S. Immigration and Customs Enforcement ("ICE") and Stewart County, Georgia.

### Jurisdiction & Venue

1

5. This Court has subject-matter jurisdiction over Plaintiff's claims under Section 504 of the Rehabilitation Act and the Alien Tort Statue pursuant to 28 U.S.C. § 1331 (federal question).

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in this District.

7. This Court has personal jurisdiction over CoreCivic because the corporation regularly conducts business in Georgia and has sufficient minimum contacts with Georgia.

8. Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over his Georgia state wrongful death claim.

## Facts

9. This case arises out of the second preventable death by suicide in less than fifteen months at Defendant CoreCivic's Inc.'s Stewart Detention Center in Lumpkin, Georgia. *See Chaverra v. United States of America*, 4:19-cv-81-CDL, ECF No. 16 (M.D. Ga filed Dec. 30, 2019.).

10. In both cases, CoreCivic placed a longtime U.S. resident with diagnosed, acute schizophrenia, a history of prior suicide attempts and involuntary commitments by correctional institutions, and documented, active suicidal ideation inside a solitary confinement cell for weeks without placing him on suicide watch, or referring him to an outside mental health provider.

11. In both cases, the decedent vocalized his intent to take his own life to CoreCivic guards and mental health professionals just days or hours before doing so.

12. In both cases, the Georgia Bureau of Investigation, federal investigative authorities, and CoreCivic's own internal investigations revealed CoreCivic guards not only failed to conduct required 30-minute visual inspections at irregular intervals in the moments leading up to the decedents' tragic suicides, but also falsified the detention logs to indicate checks happened when they did not.

13. In both cases, milestone video revealed fraud by CoreCivic in the ways the company documents its compliance with the visual-inspection-and-logging requirements of its contracts.

14. In both cases, CoreCivic ignored its own suicide prevention policies and contractually binding federal performance-based detention standards by placing and keeping the victim in solitary as punishment for displaying behaviors associated with their diagnosed mental health conditions.

15. In both cases, CoreCivic had previously placed the decedents into solitary confinement as punishment and subsequently released them into general population, only to document rapid psychological decompensation that every competent jailor and correctional medical provider knows to be associated with placing a schizophrenic human into a tiny, dark, filthy box by himself for days on end.

16. But this case, which Plaintiff brings on behalf of his son, Efrain Romero de la Rosa ("Efrain"), is far worse because the undisputed facts of CoreCivic's neglect and illegality are far more egregious than they were in the case of Jeancarlo Alfonso Jimenez Joseph ("Jean").

17. In this case, CoreCivic had the benefit of hindsight: The company knew everything about its operations that failed to save Jean's life; but elected not to address those systemic failures because to do so would render its contract to operate the Stewart Detention Center financially unviable.

18. From chronic understaffing to chronic breakdowns in communication between CoreCivic, ICE, and mental health providers, to a facility-level incapacity to care for individuals with acute mental health issues due to its remote location and inaccessibility of inpatient mental health treatment centers within a several hundred mile radius, CoreCivic knew of the deadly risks its operations posed to people like Efrain, because the Department of Homeland Security's Office of Inspector General told them in advance. It simply cost the company too much to fix the problems. So they left them all unaddressed.

19. Less than two months before Efrain died, he presented with acute psychiatric history and symptoms.

20. According to CoreCivic's records, these included up to 8 medications for his schizophrenia and associated issues, a documented prior institutionalization in a mental health treatment facility by the Virginia Department of Corrections, and Efrain himself proclaiming to mental health professionals at Stewart that he was the Anti-Christ, that he "would die three terrible deaths soon," and that he "would be dead in three days."

21. Indeed, Efrain's his post-solitary confinement mental health decompensation was so acute that CoreCivic and its government contracting partner recommended his transfer to an inpatient mental health treatment facility for stabilization.

22. That recommendation was approved, and on May 4, 2018, Efrain was transferred to Columbia Regional Care Center for inpatient mental health treatment and monitoring.

23. The first thing CoreCivic did when Efrain returned to Stewart on June 12, 2018, was bring him back to solitary confinement – a decision clinical psychologists who specialize in preventing in-custody suicides often liken to "placing an asthmatic inside a smoke-filled room."

24. The same day, Efrain informed CoreCivic personnel that he did not need to take any of the up to 8 psychiatric medications he was prescribed over the course of his custody at Stewart because "he did not need it." During that visit, Efrain once again informed jail staff he would "suffer three terrible deaths in the future."

25. CoreCivic returned Efrain to general population on June 14, 2018, but it didn't take long for the company to return to its default practice of controlling the behavioral consequences of his (now un-medicated) mental health conditions by placing him back in solitary confinement, which occurred on June 19, 2018.

26. The next day, CoreCivic officials knew or should have known that a Licensed Clinical Social Worker who spoke to Efrain documented, "limitation in mental functioning, his refusal of medical administration, and the potential of his behavior worsening."

27. On June 21, despite this diagnosis, which CoreCivic's contract requires to be taken into consideration by the company in making segregation and punishment decisions, CoreCivic official L. Gainer sentenced Efrain to 30 days in solitary confinement. This decision was Efrain's death sentence.

28. On July 10, 2018, the same day he took his own life, jail officials documented that Efrain "would benefit from referral to a higher level of care mental health facility." This conclusion was prompted – the morning Efrain took his own life – by his statements to facility mental health staff that that he "was going to die" and therefore "did not need" his medication.

29. During his time in a caged recreation cell on the day he died, Efrain told a CoreCivic guard in full earshot of a fellow detained immigrant who was also doing time in solitary confinement that he intended to end his life later in the day.

30. Contrary to all policies, contractual requirements, and human decency, the guard, in an exchange caught on video, laughed at Efrain and mocked him.

31. The guard took none of the mandatory steps CoreCivic is required to carry out when presented with a person actively endorsing a suicide plan.

32. The guard, who would later be seen hovering by the door and windows during interviews between detained immigrants and GBI investigators who sought to get to the bottom of Efrain's death, actively intimidated those witnesses into staying silent about his advance knowledge of Efrain's death.

33. In the hours leading up to Efrain's suicide, which would not have been possible had CoreCivic placed him on the required one-to-one suicide watch, or, at minimum 15-minute visual checks required for people like Efrain who were suicide risks, CoreCivic guards failed to perform the required visual checks and falsified their logs to indicate that they had.

34. In the case of Jean Jimenez, just 14 months prior, CoreCivic guard Freddy Wims was fired for engaging in this conduct and referred to the United States Attorney's Office for the Middle District of Georgia for criminal prosecution.

35. When asked why he falsified the logs, Wims explained that he simply could not have done all of the tasks required of him because, in addition to working the back end of a 24-hour double-shift, he was short-staffed in the segregation unit.

36. After Jean's death and Wims' firing, CoreCivic was aware that several other guards serially falsified their segregation logs using one of several mental-math exercising for calculating irregular 30-minute intervals that is so consistent across multiple logs and among different officers that, upon information and belief, CoreCivic's supervisors were aware of it.

37. The night Efrain died, CoreCivic guards engaged in the same conduct.

38. Once a CoreCivic officer finally discovered Efrain's apparently lifeless body hanging inside his solitary confinement cell after 10:30 p.m., the company's serial shortchanging of basic necessities deprived emergency responders of any chance to save him.

39. The oxygen tank was broken; inspecting and fixing it would have cost too much.

40. The defibrillator didn't work; regular checks and training to verify it would be available in an emergency like Efrain's would have cut into CoreCivic's profits on the fixed-price agreement it made with ICE and Stewart County, where every penny saved in services to the people inside the Stewart Detention Center translate into pennies earned for shareholders and corporate executives.

41. Training the guards on how to effectively respond proved too costly, too: It took five minutes before anyone called 911.

42. Any chance Efrain may have had at surviving his tragic, announced suicide attempt vanished because CoreCivic failed to adequately train and inspect its own facility for just this occasion, when it mattered most.

43. Efrain Romero de la Rosa did not have to die.

44. Had CoreCivic complied with its own policies, its contractually binding detention standards, the standard of care for treating individuals with mental health issues in custody, the anti-discrimination provisions of Section 504 of the Rehabilitation Act and the Alien Tort Statute, Efrain would not have died on July 10, 2018.

45. But compliance would have cost too much, so Efrain is dead, and his father hereby demands compensatory and punitive damages from CoreCivic in the amount of $50,000,000.00.

## CLAIMS FOR RELIEF
### COUNT ONE: WRONGFUL DEATH

46. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

47. CoreCivic's failure to follow its own binding contractual requirements for treatment of detained immigrants at Stewart with severe mental health conditions and failure to adequately care for Efrain while in the company's custody breached the applicable standard of care and was negligent and negligent per se.

48. CoreCivic's negligence included, but was not limited to, placing Efrain into solitary confinement notwithstanding his documented mental health conditions and disabilities, failing to comply with the company's suicide prevention protocols, failing to conduct required visual checks, failing to engage in mandatory, non-discretionary intervention upon learning he intended to end his life on the morning he did so, and failing to place him on suicide watch.

49. CoreCivic breached its heightened duty of care to Efrain as a person in its physical custody who could not provide these services for himself by failing to adequately train and supervise its employees, failing to properly staff the segregation unit at all times, failing to monitor compliance with preparedness requirements for medical emergencies in segregation, and failure to refer Efrain to a higher-level treatment facility as soon as he displayed behaviors that were nearly identical to the ones which previously resulted in his referral to an inpatient treatment center.

50. The negligent acts and omissions of CoreCivic and its agents or employees who acted within the scope of their employment for CoreCivic proximately caused Efrain's death.

51. It was reasonably foreseeable that placing Efrain into solitary confinement would leave him at heightened risk of suicide, that ignoring and mocking his self-described plan to end his life could lead to his death, that chronically understaffing, undertraining, and under-supervising the facility, and that failing to conduct the required visual checks as part a of a pattern of falsifying segregation logs would result in failure to observe and intervene in Efrain's suicide effectively to prevent his death.

52. Because CoreCivic's negligence, negligence per se, and recklessness proximately caused Efrain's death, Georgia law allows Plaintiff to recover for the full value of Efrain's life, and to seek punitive damages in these circumstances, which present wanton, reckless, and depraved actions by CoreCivic which will continue to claim the lives of people locked inside its facilities in the absence of judicial opprobrium and punishment by a jury.

### COUNT TWO: TORTURE

53. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

54. The Alien Tort Statute, enacted in 1789, permits non-citizens to bring suit in U.S. courts for violations of the law of nations or a treaty of the United States. Under the ATS, federal courts are authorized to recognize a common-law cause of action for violations of clearly defined, widely accepted human rights norms. *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

55. The Convention Against Torture and Other Cruel Inhuman and Degrading Treatment constitutes a clearly defined, widely accepted human rights norm. The United States is a party to the Convention, and has implemented its obligations in domestic law. *See, e.g.*, 8 C.F.R. § 208.18.

56. Defendants' conduct described herein constitutes torture and cruel, inhuman, and degrading treatment, a violation of "specific, universal, and obligatory" international law norms, as evidenced by

numerous binding international treaties, declarations, and other international law instruments. *Sosa*, 542 U.S. at 732. Accordingly, Defendants' conduct is actionable under the ATS.

57. CoreCivic tortured Efrain to death and subjected him to cruel, inhuman, and degrading treatment under color of law by intentionally inflicting severe physical and mental pain and suffering upon him for the purpose of punishing him, intimidating him, or coercing him under color of law.

58. Specifically, CoreCivic ordered Efrain's placement for 30 days in prolonged solitary confinement as punishment.

59. CoreCivic subjected Efain to prolonged solitary confinement specifically intending to cause him severe mental or physical pain and suffering sufficient to alter his behavior and deter others in SDC from engaging in similar behaviors.

60. CoreCivic was specifically aware that Efrain's prior period of solitary confinement had resulted in his psychological decompensation that was so severe it required his removal from the facility to a psychiatric treatment facility.

61. CoreCivic's torture and cruel, inhuman, and degrading treatment of Efrain caused his death.

62. CoreCivic's acts and omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Efrain's rights under international and U.S. law and should be punished by an award of punitive damages in an amount to be determined at trial.

63. No absolute or qualified immunity exists to shield these Defendants from liability.

## COUNT THREE: DISABILITY DISCRIMINATION

64. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

65. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability in (1) any program or activity receiving federal financial assistance; or (2) under any program or activity conducted by any Executive agency or the United States Postal Service. 29 U.S.C. § 794.

66. CoreCivic operated a program or activity at the Stewart Detention Center for ICE, and it receives federal financial assistance.

67. For example, CoreCivic's federal financial assistance includes subsidies the corporation receives in connection with its Voluntary Work Program for federal detainees housed at CoreCivic facilities, through which: (a) The United States authorizes CoreCivic to use detainees to perform essential work at wages far, far below market rates, work that CoreCivic would otherwise be required to carry out with additional staff hired from the community at market rates, thus providing GEO a significant financial benefit; (b) The United States provides CoreCivic a stipend of $1 per day for each detainee who participates in the Voluntary Work Program.

68. Additionally, CoreCivic operates a program or activity conducted by an Executive agency.

69. Specifically, ICE is a component agency of the U.S. Department of Homeland Security (DHS), which is an Executive agency. See 6 C.F.R. § 15.1.

70. In its Component Self-Evaluation and Planning Reference Guide, DHS acknowledges that its "federally conducted programs" include "operation of immigration detention facilities."

71. The DHS document further states that "[a] Component's activities carried out through contracts are considered conducted activities and are subject to the same obligations [of complying with the Rehabilitation Act]." *Id.*; *see also* Instruction on Nondiscrimination For Individuals With Disabilities In DHS-Conducted Programs And Activities (Non-Employment), DHS Directives System Instruction No. 065-01-001 (defining conducted activities of DHS to include "those carried out through contractual or licensing arrangements").

72. Efrain was an individual with a disability. He had schizophrenia, a mental health condition recognized as a qualifying disability under federal law.

73. In June of 2018, CoreCivic retrieved Efrain from an in-patient mental health treatment facility and brought him to Stewart.

74. CoreCivic discriminated against Efrain solely because of his disability. Efrain suffered intentional discrimination by CoreCivic in the disciplinary process solely because he suffered from schizophrenia which CoreCivic refused to control.

75. CoreCivic's policies and practices manifest deliberate intentional discrimination and/or deliberate indifference to the likelihood that detainees with schizophrenia would suffer illegal discrimination at Stewart. CoreCivic failed to ensure that its staff had appropriate training for responding to detained migrants, like Efrain and Jean, who suffered from schizophrenia.

76. CoreCivic's disability discrimination in violation of the Rehabilitation Act caused Jean's death.

77. Accordingly, Plaintiff seeks compensatory and punitive damages and attorney's fees.

## REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1. Enter judgment in favor of Plaintiff and against all Defendants.

2. Award Plaintiff compensatory damages in an amount to be determined at trial.

3. Award Plaintiff punitive damages in an amount not to exceed ten times the compensatory damages award determined at trial.

4. Award Plaintiff reasonable attorney's fees and costs pursuant to federal and state fee-shifting statutes.

5. Award interest from the date of each violation.

6. Award any other relief this Court deems just and proper.

Date: July 9, 2020                                   Respectfully submitted,

                                                     **/s/G. Brian Spears**
                                                     G. Brian Spears, Ga. Bar No. 670112
                                                     1126 Ponce De Leon Ave. NE
                                                     Atlanta, Georgia 30306
                                                     (404) 872-7086 (tel)
                                                     (404) 892-1128 (fax)

bspears@brianspearslaw.com


/s/ R. Andrew Free*
**R. ANDREW FREE, No. 30513**
P.O. Box 90568
Nashville, TN 37209
Tel. 844-321-3221
Fax: 615-829-8959
Andrew@immigrantcivilrights.com
*Counsel for the Plaintiff*

*\*Application for Admission Pro Hac Vice Forthcoming*