## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | | |
|---|---|---|
| **EFRAIN ROMERO-GARCIA**, as father and statutory next-of-kin of Efrain Romero de la Rosa; | ) ) ) | |
| | ) | Civil Action No.: |
| *Plaintiff*, | ) | 4:20-cv-00158-CDL |
| | ) | |
| v. | ) | **FIRST AMENDED** |
| | ) | **COMPLAINT** |
| **CORECIVIC, INC.,** | ) | |
| | ) | |
| *Defendant,* | ) | |

### Introduction

1. This is a wrongful death action for compensatory and punitive damages arising out of the preventable suicide inside a solitary confinement cell at the Stewart Detention Center by Efrain Romero de la Rosa ("Efrain"), a 38 year-old longtime U.S. resident who suffered from acute schizophrenia.

### Parties

2. Plaintiff Efrain Romero-Garcia ("Plaintiff") is an adult resident of Mexico. He is the father and next-of-kin of Efrain, who died with no surviving spouse or children.

1

3.   At all times relevant to this Complaint, Defendant CoreCivic, Inc. ("CoreCivic" or "Defendant'') was a publicly-traded Real Estate Investment Trust[1] incorporated under the laws of the State of Maryland and headquartered just outside of Nashville, Tennessee.

4.   At all times relevant to this Complaint, Defendant owned and operated the Stewart Detention Center in Lumpkin, Georgia ("Stewart" or "Stewart Detention Center") pursuant to a pass-through Inter-Governmental Services Agreement between U.S. Immigration and Customs Enforcement ("ICE") and Stewart County, Georgia.

## Jurisdiction & Venue

5.   This Court has subject-matter jurisdiction over Plaintiff's claims under Section 504 of the Rehabilitation Act and the Alien Tort Statute pursuant to 28 U.S.C. § 1331 (federal question).

6.   Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in this District.

---

[1] In August 2020, CoreCivic announced its intent to revoke its REIT status and revert to its prior corporate structure as a C-corporation on January 1, 2021. At all times relevant to this Complaint, CoreCivic acted as a REIT. *See* https://www.globenewswire.com/news-release/2020/08/05/2073709/0/en/ CoreCivic-Announces-Change-in-Corporate-Structure-and-New-Capital-Allocation-Strategy.html.

7. This Court has personal jurisdiction over CoreCivic because the corporation regularly conducts business in Georgia and has sufficient minimum contacts with Georgia.

8. Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over his Georgia state wrongful death claim.

### Facts

9. This case arises out of the second preventable death by suicide in less than fifteen months at Stewart Detention Center, owned and operated by CoreCivic. *See Chaverra v. United States of America*, 4:19-cv-81-CDL, 2020 WL 5579554 (M.D. Ga. filed Dec. 30, 2019).

10. In both cases, CoreCivic placed a longtime U.S. resident with diagnosed, acute schizophrenia, a history of prior suicide attempts and involuntary commitments by correctional institutions, and documented, active suicidal ideation inside a solitary confinement cell for weeks without placing him on suicide watch or referring him to an outside mental health provider.

11. In both cases, the decedent vocalized his intent to take his own life to CoreCivic guards and mental health professionals just days or hours before actually doing so.

12. In both cases, the Georgia Bureau of Investigation ("GBI"), federal investigative authorities, and CoreCivic's own internal investigations revealed

CoreCivic guards not only failed to conduct required 30-minute visual inspections of prison cells at irregular intervals in the moments leading up to both decedents' tragic suicides, but also falsified the detention logs to indicate checks happened when they did not.

13. In both cases, milestone video revealed fraud by CoreCivic in the ways the company documents its compliance with the visual-inspection-and-logging requirements of its contracts with ICE.

14. In both cases, CoreCivic ignored its own suicide prevention policies and contractually binding federal performance-based detention standards by placing and keeping the victims in solitary confinement as punishment for displaying behaviors associated with their diagnosed mental health conditions.

15. In both cases, CoreCivic had previously placed the decedents into solitary confinement as punishment and subsequently released them into general population, only to document rapid psychological decompensation that every competent jailor and correctional medical provider knows to be associated with placing a schizophrenic human into a tiny, dark, filthy box by himself for days on end.

16. But this action carries even more inexcusable culpability for CoreCivic because the undisputed facts of its neglect and illegality are even more egregious, foreseeable, and preventable than they were in the case of Jeancarlo Alfonso

4

Jimenez Joseph ("Jean"), whose death at Stewart was the first in more than six years.[2]

17. In this action, CoreCivic had the benefit of hindsight: The company knew everything about its operations that failed to save Jean's life, but elected not to address those systemic failures because to do so would render its contract to operate the Stewart Detention Center financially unviable.

18. From chronic understaffing to chronic breakdowns in communication between CoreCivic, ICE, and mental health providers, to a facility-level incapacity to care for individuals with acute mental health issues due to its remote location and inaccessibility to inpatient mental health treatment centers within a several hundred mile radius, CoreCivic knew of the deadly risks its operations posed to people like Efrain, because the Department of Homeland Security's Office of Inspector General told them in advance. It cost CoreCivic too much money to fix the problem, so they simply left them all unaddressed.

19. Less than two months before Efrain died, he presented with acute psychiatric history and psychotic symptoms.

20. According to CoreCivic's records, these included up to 8 medications for his schizophrenia and associated issues, a documented prior institutionalization in a

---

[2] Since Jean's death, at least six more men have died at Stewart: Yulio Castro Garrido, Efrain Romero de la Rosa, Pedro Arriago-Santoya, Santiago Baten-Oxlaj, Jose Guillen-Vega, and Cipriano Chavez-Alvarez, making it among the deadliest ICE detention facilities in the United States.

mental health treatment facility by the Virginia Department of Corrections, and Efrain himself proclaiming to mental health professionals at Stewart that he was the Anti-Christ, that he "would die three terrible deaths soon," and that he "would be dead in three days."

21. Indeed, Efrain's post-solitary confinement mental health decompensation was so acute that CoreCivic and its government contracting partner recommended his transfer from Stewart to an inpatient mental health treatment facility for stabilization.

22. That recommendation was approved, and on May 4, 2018 Efrain was transferred to Columbia Regional Care Center for inpatient mental health treatment and monitoring.

23. Despite sending Efrain to an outside institution due to the magnitude of his mental health issues, the first thing CoreCivic did when Efrain returned to Stewart on June 12, 2018, was to place him back into solitary confinement – a decision clinical psychologists who specialize in preventing in-custody suicides often liken to "placing an asthmatic inside a smoke-filled room."

24. The same day, Efrain informed CoreCivic personnel that he did not need to take any of the up to 8 psychiatric medications he was prescribed over the course of his custody at Stewart because "he did not need it." During that visit, Efrain once again informed jail staff he would "suffer three terrible deaths in the future."

6

25. CoreCivic returned Efrain to general population on June 14, 2018, but it did not take long for the company to return to its default practice of controlling the behavioral consequences of his (now un-medicated) mental health conditions by placing Efrain back in solitary confinement, which occurred on June 19, 2018.

26. The next day, CoreCivic officials knew or should have known that a Licensed Clinical Social Worker who spoke to Efrain documented his "limitation in mental functioning, his refusal of medical administration, and the potential of his behavior worsening."

27. On June 21, despite this diagnosis, which CoreCivic's contract with ICE requires to be taken into consideration by the company in making segregation and punishment decisions, CoreCivic official L. Gainer sentenced Efrain to 30 days in solitary confinement. This decision was Efrain's death sentence.

28. On July 10, 2018, the same day he took his own life, jail officials documented that Efrain "would benefit from referral to a higher level of care mental health facility." This conclusion was prompted – the morning Efrain took his own life – by his statements to CoreCivic mental health staff that that he "was going to die" and therefore "did not need" his medication.

29. During his time in a caged recreation cell on the day he died, Efrain told a CoreCivic guard in full earshot of a fellow detained immigrant who was also doing time in solitary confinement that he intended to end his life later in the day.

30. Contrary to all policies, contractual requirements, and human decency, the guard, in an exchange caught on video, laughed at Efrain and mocked him.

31. The guard took none of the mandatory steps CoreCivic is required to carry out when presented with a person actively endorsing a suicide plan.

32. The guard, who would later be seen hovering by the door and windows during interviews between detained immigrants and GBI investigators who sought to get to the bottom of Efrain's death, actively intimidated those witnesses into staying silent about his advance knowledge of Efrain's intent to commit suicide.

33. In the hours leading up to Efrain's suicide, which would not have been possible had CoreCivic placed him on the required one-to-one suicide watch, or at minimum 15-minute visual checks required for people like Efrain who were suicide risks, CoreCivic guards failed to perform the required visual checks and falsified their logs to indicate that they had.

34. In the case of Jean Jimenez, just 14 months prior, CoreCivic guard Freddy Wims was fired for engaging in this conduct and referred to the United States Attorney's Office for the Middle District of Georgia for criminal prosecution.

35. When asked why he falsified the logs, Wims explained that he simply could not have done all of the tasks required of him because, in addition to working the back end of a 24-hour double-shift, he was short-staffed in the segregation unit.

36. After Jean's death and Wims' firing, CoreCivic was aware that several other guards serially falsified their segregation logs using one of several mental-math exercises for calculating irregular 30-minute intervals that is so consistent across multiple logs and among different officers that, upon information and belief, CoreCivic's supervisors were aware of it.

37. The night Efrain died, CoreCivic guards engaged in the same conduct.

38. Once a CoreCivic officer finally discovered Efrain's apparently lifeless body hanging inside his solitary confinement cell after 10:30 p.m., the company's serial shortchanging of basic necessities deprived emergency responders of any chance to save him.

39. The oxygen tank was broken; inspecting and fixing it would have cost too much.

40. The defibrillator did not work, regular checks and training to verify its availability and proper function for an emergency like Efrain's would have cut into CoreCivic's profits on the fixed-price agreement it made with ICE and Stewart County, where every penny saved in services to the people inside the Stewart Detention Center translate into pennies earned for shareholders and corporate executives.

41. Training the guards on how to effectively respond to emergencies, and specifically inmate suicide, proved too costly, too: It took five minutes before anyone called 911.

42. Any chance Efrain may have had at surviving his tragic, announced suicide attempt vanished because CoreCivic failed to adequately train and inspect its own facility for just this occasion, when it mattered most.

43. Efrain Romero de la Rosa did not have to die.

44. Had CoreCivic complied with its own policies, its contractually binding detention standards, the standard of care for treating individuals with mental health issues in custody, and the anti-discrimination provisions of Section 504 of the Rehabilitation Act and the Alien Tort Statute, Efrain would not have died on July 10, 2018.

45. But compliance would have cost too much, so Efrain is dead, and his father hereby demands compensatory and punitive damages from CoreCivic in the amount of $50,000,000.00.

## CLAIMS FOR RELIEF
### COUNT ONE: WRONGFUL DEATH

46. CoreCivic's failure to follow its own binding contractual requirements for treatment of detained immigrants at Stewart with severe mental health conditions and failure to adequately care for Efrain while in the company's custody breached the applicable standard of care and was negligent and negligent per se.

10

47. CoreCivic's negligence included, but was not limited to, placing Efrain into solitary confinement notwithstanding his documented mental health conditions and disabilities, failing to comply with the company's suicide prevention protocols, failing to conduct required visual checks, failing to engage in mandatory, non-discretionary intervention upon learning he intended to end his life on the morning he did so, and failing to place him on suicide watch.

48. CoreCivic breached its heightened duty of care to Efrain as a person in its physical custody who could not provide these services for himself by failing to adequately train and supervise its employees, failing to properly staff the segregation unit at all times, failing to monitor compliance with preparedness requirements for medical emergencies in segregation, and failure to refer Efrain to a higher-level treatment facility as soon as he displayed behaviors that were nearly identical to the ones which previously resulted in his referral and removal to an inpatient treatment center.

49. The negligent acts and omissions of CoreCivic and its agents or employees who acted within the scope of their employment for CoreCivic proximately caused Efrain's death.

50. It was reasonably foreseeable that placing Efrain into solitary confinement would leave him at heightened risk of suicide, that ignoring and mocking his self-described plan to end his life could lead to his death, that chronically understaffing,

undertraining, and under-supervising the facility, and that failing to conduct the required visual checks as part of a pattern of falsifying segregation logs would result in failure to observe and intervene in Efrain's suicide effectively to prevent his death.

51. Because CoreCivic's negligence, negligence per se, and recklessness proximately caused Efrain's death, Georgia law allows Plaintiff to recover for the full value of Efrain's life, and to seek punitive damages in these circumstances, which present wanton, reckless, and depraved actions by CoreCivic, which will continue to claim the lives of people locked inside its facilities in the absence of judicial opprobrium and punishment by a jury.

## COUNT TWO: TORTURE & CRUEL, INHUMANE, AND DEGRADING TREATMENT

52. The Alien Tort Statute ("ATS"), enacted in 1789, permits non-citizens to bring suit in U.S. courts for violations of the law of nations or a treaty of the United States. Under the ATS, federal courts are authorized to recognize a common-law cause of action for violations of clearly defined, widely accepted human rights norms.

53. The United States has signed and ratified with reservations, understanding, and declarations ("RUDs")[3] binding treaties banning punishment of prolonged solitary confinement and solitary confinement of persons with mental illness for

---

[3] *See, e.g.,* https://treaties.un.org/Pages/ViewDetails.aspx?
src=treaty&mtdsg_no=iv-9&chapter=4&lang=en#EndDec

any period because it constitutes cruel, inhuman and degrading treatment ("CIDT") and torture.

54. The Convention Against Torture and Other Cruel Inhuman and Degrading Treatment ("CAT") constitutes a clearly defined, widely accepted human rights treaty obligation that the United States has signed and ratified (with RUDs), ratified October 21, 1994, 1465 U.N.T.S. 85 (entered into force June 26, 1987).

55. The United States, as a state party to the CAT, has implemented its obligations in domestic law. *See, e.g.*, 8 C.F.R. § 208.18.

56. Articles 1(1) and 16(1) of the CAT define torture and require the United States to prevent it and CIDT within its jurisdiction.

57. The United States has adopted with RUDs the International Covenant on Civil and Political Rights ("ICCPR"). International Covenant on Civil and Political Rights art. 7, ratified June 8, 1992, 999 U.N.T.S. 171 (entered into force March 23, 1976)

58. Art. 7 of the ICCPR states: "No one shall be subjected to torture or [CIDT] or punishment . . . .", and Art. 4(2) establishes this as a non-derogable peremptory norm.

59. The U.N. Special Rapporteur on Torture and Other CIDT has stated that the "imposition, of any duration, on persons with mental disabilities is cruel, inhuman or degrading treatment. (A/66/268, paras. 67-68, 78). Moreover, any restraint on

people with mental disabilities for even a short period of time may constitute torture and ill-treatment." Special Rapporteur on Torture and Other [CIDT], *Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment*, ¶ 63, U.N. Doc. A/HRC/22/53 (Feb. 1, 2013) Juan Mendez.

60. Defendant's conduct described herein constitutes torture and cruel, inhuman, and degrading treatment, a violation of "specific, universal, and obligatory" international law norms, as evidenced by numerous binding international treaties, declarations, and other international law instruments. Accordingly, Defendant's conduct is actionable under the ATS.

61. CoreCivic tortured Efrain to death and subjected him to CIDT by intentionally inflicting severe physical and mental pain and suffering upon him for the purpose of punishing him, intimidating him, or coercing him under color of law.

62. Specifically, CoreCivic supervisors ordered, and the facility administrator repeatedly ratified, Efrain's placement for 30 days in prolonged solitary confinement as punishment for an infraction of the facility's disciplinary code, which infraction stemmed from behaviors associated with Efrain's mental health condition.

63. CoreCivic subjected Efrain to prolonged solitary confinement specifically intending to cause him severe mental or physical pain and suffering sufficient to alter his behavior and deter others in SDC from engaging in similar behaviors.

64. CoreCivic was specifically aware that Efrain's prior period of solitary confinement had resulted in his psychological decompensation that was so severe it required his removal from the Stewart facility to an outside psychiatric treatment facility, and specifically chose not just to re-inflict the trauma of solitary confinement on Efrain again, but to repeatedly ratify that decision even as behavioral health officials observed his psychiatric decompensation and need for relocation as a result.

65. CoreCivic security supervisors knew that 30 days in solitary confinement – the maximum possible sentence available to the company – would inflict severe psychological pain and put Efrain at an acute risk of suicide.

66. Indeed, as a matter of corporate policy, every CoreCivic detention officer at Stewart is required to receive suicide prevention training that specifically warns of the acute risks of solitary confinement for people with past histories of suicidal ideation, involuntary commitment, or diagnoses like the one Efrain lived with.

67. And CoreCivic executives in Tennessee and supervisors at Stewart knew something else: Solitary confinement at Stewart of a schizophrenic person with a

prior history of involuntary psychiatric commitment and suicidal ideation resulted in that person's death just 13 months before.

68. By the time CoreCivic made the determination to place Efrain in prolonged solitary confinement, no senior official had any illusions about the deadly consequences it could have.

69. Painfully aware of the specific form of acute suffering and harm disciplinary segregation as punishment would inflict on a floridly untreated schizophrenic detained person whose behavior had already created a disruption at the facility, CoreCivic condemned Efrain to the acute psychological, emotional, and physical pain and suffering with the intention to punish him.

70. CoreCivic's torture and CIDT of Efrain caused his death.

71. CoreCivic's acts and omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Efrain's rights under international and U.S. law and should be punished by an award of punitive damages in an amount to be determined at trial.

72. No absolute or qualified immunity exists to shield CoreCivic from liability.

### COUNT THREE: DISABILITY DISCRIMINATION

73. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability in (1) any program or activity receiving

federal financial assistance; or (2) under any program or activity conducted by any Executive agency or the United States Postal Service. 29 U.S.C. § 794.

74. CoreCivic operated a program or activity at the Stewart Detention Center for ICE, and it receives federal financial assistance.

75. For example, CoreCivic's federal financial assistance includes subsidies that the corporation receives in connection with its Voluntary Work Program for federal immigration detainees housed at CoreCivic facilities, through which: (a) the United States authorizes CoreCivic to use detainees to perform essential work at wages far, far below market rates, work that CoreCivic would otherwise be required to carry out with additional staff hired from the community at market rates, thus providing CoreCivic a significant financial benefit; and (b) the United States provides CoreCivic a stipend of $1 per day for each detainee who participates in the Voluntary Work Program. *See* 8 U.S.C. § 1555(d); *Barrientos v. CoreCivic*, 951 F.3d 1269 (11th Cir. 2020).

76. Additionally, CoreCivic operates a program or activity conducted by an Executive agency.

77. Specifically, ICE is a component agency of the U.S. Department of Homeland Security ("DHS"), which is an Executive agency. *See* 6 C.F.R. § 15.1.

78. In its Component Self-Evaluation and Planning Reference Guide, DHS acknowledges that its "federally conducted programs" include "operation of immigration detention facilities."

79. The DHS document further states that "[a] Component's activities carried out through contracts are considered conducted activities and are subject to the same obligations [of complying with the Rehabilitation Act]." *Id*.; *see also* Instruction on Nondiscrimination For Individuals With Disabilities In DHS-Conducted Programs And Activities (Non-Employment), DHS Directives System Instruction No. 065-01-001 (defining conducted activities of DHS to include "those carried out through contractual or licensing arrangements").

80. Efrain was an individual with a disability. He had schizophrenia, a mental health condition recognized as a qualifying disability under federal law.

81. In June of 2018, after having sent Efrain to an inpatient mental health treatment facility due to serious mental health episodes that took place at Stewart, CoreCivic retrieved Efrain from that in-patient mental health treatment facility and brought him back to Stewart.

82. As a result of binding, non-discretionary corporate and contractual policies regarding identification of individuals with serious mental illness or other special vulnerabilities upon an person's admission to Stewart, CoreCivic's facility

administrators and security knew of and created digital records denoting Efrain's status as a person with a qualifying disability.

83. Efrain was legally entitled to participate in the federal programs CoreCivic administers at Stewart free from disability discrimination.

84. One federal program administered by CoreCivic at Stewart includes ensuring detained immigrants like Efrain meaningful access to and participation in the adjudication of the charges justifying his detention at Stewart, determination of his eligibility for release from custody pending resolution of those charges, and adjudication of his claims for relief in removal proceedings conducted by the Department of Justice's Executive Office for Immigration Review, assuming he must remain in custody at Stewart. *See generally* 8 U.S.C. §§ 1229 (setting forth rights of noncitizens against who the government initiates removal proceedings), 1229a(b)(4), 1229a(c)(2)(B), 1229a(c)(4).

85. In addition, Congress has required ICE to ensure contractors like CoreCivic fully implement the programmatic guarantees of the 2011 ICE Performance-Based National Detention Standards (rev. 2016) ("PBNDS").

86. As administered by contractual agreement at Stewart, the PBNDS constitutes a federal program under the authority of 8 U.S.C. § 1103(a)(11) that ensures access to telephone calls, adequate medical, dental, and mental health care,

recreation, commissary, law library, visitation, counsel, and appropriate classification in civil immigration detention.

87. CoreCivic discriminated against Efrain because of his disability in a myriad of interconnected ways:

    a. **Four O'Clock Sick Calls.** *First*, pursuant to longstanding corporate practice at Stewart and elsewhere, and as observed by DHS's Office of Inspector General, the company intentionally discriminated against Efrain and individuals like him who suffer from qualifying mental health disabilities by requiring them to voluntarily report to sick call care at 4:00 a.m. – or else go without care. DHS-OIG FOIA Response 2018-IGFO-00059 at 35. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf. The intended and practical effect of CoreCivic's early sick call policy, which is set and approved by the company and its facility administrator or their designee, is to reduce the appearance of individuals with qualifying mental health disabilities like Efrain at the company's infirmary during sick call, and to tacitly discourage those individuals from seeking care for more transient symptoms or decompensations that do not seem as pressing. As a consequence of making sick call functionally less available to

people with disabilities, CoreCivic reduces both the mental healthcare available to them and its own staffing and medical costs, thus enhancing its profits. CoreCivic thus failed to reasonably accommodate Efrain – whose regular sleep cycle was vital to his ongoing battle with schizophrenia inside a carceral environment. Alternatively, CoreCivic's early sick-call policy disparately impacted Efrain and others like him, violating his rights under Section 504.

b. **Using Solitary to Manage Decompensation of Mentally Ill Immigrants.** *Second*, CoreCivic engaged in a well-documented practice of relying on solitary confinement to manage the behavior of individuals like Efrain with mental health disabilities like schizophrenia. Pursuant to this practice, CoreCivic Security Supervisors and the Facility Administrator actively ignores binding contractual requirements from ICE in their disciplinary decisions and process. *See* PBNDS Disciplinary Section and the SMI policy. Instead of ensuring individuals with mental health disabilities and serious mental illness are accommodated by taking into consideration whether their disciplinary offenses are the result of decompensation and/or symptoms of mental illness, and instead of providing a care advocate or behavioral health resource to explain to individuals like Efrain their

rights to challenge the charges against them in disciplinary

proceedings, CoreCivic ignores these disabilities and fails to

accommodate them. The result is a sentence of prolonged solitary

confinement that, as in the case of both Jean and Efrain, so

exacerbated the pre-existing schizophrenic decomposition episode

which led to the original disciplinary infraction as to cause their

needless, preventable suffering and ultimate death.

c.  **Solitary for Speaking Out About Suicidal Ideation.** *Third*,

CoreCivic discriminated against Efrain, as it does all individuals with

mental health-related disabilities, by responding to expressions of

suicidal ideation not as immediate cries for help, but as behaviors

requiring more solitary confinement. Pursuant to company policy, an

individual with a mental health disability like Efrain's who expresses

suicidal ideation is automatically referred to segregation and solitary

confinement. Efrain and those like him faced a choice: They can

honestly share their suicidal thoughts with the behavioral health

professionals who could recommend a higher level of care but, as a

result of CoreCivic's practice of confining suicidal people in solitary,

risk a prolongation of their solitary confinement; or they can keep

quiet and suffer in the hopes that the urge to end their own life will

subside by the time their sentence is up. CoreCivic's policy and practice of responding to suicidal ideation with solitary confinement discriminated against Efrain by failing to make reasonable accommodations and having a disparate impact on his rights as a result of his qualifying disability.

d. **Failure to Notify Officers of People With Disabilities.** *Fourth*, CoreCivic supervisors have engaged in a well-documented pattern of refusing to share with detention officers vital mental health-related suicide-risk information about detained immigrants at Stewart based on the false premise that to do so would violate their privacy rights. As a result, CoreCivic ensures its detention officers and the individuals in the disciplinary process lack access to the information behavioral health professionals have when assessing the need to discipline and segregate people with mental illness-based disabilities.

e. **Failure to Observe & Monitor People in Solitary.** *Fifth,* once CoreCivic places individuals with mental health-related disabilities into solitary confinement, systematically it neglects to care for and supervise them within the regular intervals required by ICE. Specifically, CoreCivic Chief of Security and Facility Administrator personnel fail to appropriately document individuals' disabilities and,

in the case of mental health-related disabilities, to ensure the 15-minute or 1:1 observations required by their contract with ICE and the PBNDS. By refusing to grant Efrain the accommodation ICE required – i.e., more frequent, intensive supervision while in solitary confinement, CoreCivic discriminated against him on the basis of his disability. Then, having incorrectly determined Efrain (and Jean) required only irregular checks, CoreCivic's corporate management and facility administration supervisors engage in patterns of understaffing within the Special Housing Unit at Stewart that prevents its detention officers assigned from conducting the required visual examinations within the time periods required. Finally, rather than holding supervisors and administrators accountable for allowing detention officers to serially falsify the visual inspection logs, or deploying a more accountable electronic system that would allow for closer auditing and penalization for missed checks, CoreCivic management simply allow the serial falsification of observation logs until it is discovered when individuals who are not monitored take their own lives and the video demonstrates the officers' falsehoods.

f.  **Failure to Use Less-Restrictive Alternatives to Solitary Confinement.** *Sixth*, CoreCivic fails to regularly review the

appropriateness of less-restrictive alternatives to solitary confinement for individuals like Efrain with serious mental illness. CoreCivic's policies and ICE's contract requires the facility administrator and an interdisciplinary staff to conduct regular, periodic review of people in solitary confinement who suffer from mental health-related disabilities, and to consider them for release to general population. Pursuant to CoreCivic's corporate practice at Stewart, supervisory staff failed entirely to consider Efrain for alternative placement during the weeks he spent in solitary confinement.

88. Efrain suffered intentional discrimination by CoreCivic in the disciplinary process solely because he suffered from schizophrenia which CoreCivic refused to control.

89. CoreCivic's policies and practices manifest deliberate intentional discrimination and/or deliberate indifference to the likelihood that detainees with schizophrenia would suffer illegal discrimination at Stewart and otherwise failed to reasonably accommodate Efrain. CoreCivic failed to ensure that its staff had appropriate training for responding to detained migrants, like Efrain and Jean, who suffered from schizophrenia.

90. CoreCivic's disability discrimination in violation of the Rehabilitation Act caused Efrain's death.

91. Accordingly, Plaintiff seeks compensatory and punitive damages and attorney's fees.

## **REQUEST FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court:

1. Enter judgment in favor of Plaintiff and against Defendant.

2. Award Plaintiff compensatory damages in an amount to be determined at trial.

3. Award Plaintiff punitive damages in an amount not to exceed ten times the compensatory damages award determined at trial.

4. Award Plaintiff reasonable attorney's fees and costs pursuant to federal and state fee-shifting statutes, and O.C.G.A. § 13-6-11.

5. Award interest from the date of each violation.

6. Award all relief to which Plaintiff is entitled, whether explicitly pleaded or not.

7. Award any other relief this Court deems just, equitable, and proper.

Date: December 4, 2020                    Respectfully submitted,

**/s/G. Brian Spears**
G. Brian Spears
Georgia Bar No. 670112

**/s/Jeff Filipovits**
Jeff Filipovits
Georgia Bar No. 825553

Spears & Filipovits, LLC
1126 Ponce De Leon Ave. NE
Atlanta, Georgia 30306
(404) 872-7086 (tel)
(404) 892-1128 (fax)
bspears@brianspearslaw.com
jeff@civil-rights.law

**/s/R. Andrew Free\***
R. ANDREW FREE
Tennessee Bar No. 30513
P.O. Box 90568
Nashville, TN 37209
Tel. 844-321-3221
Fax: 615-829-8959
Andrew@immigrantcivilrights.com
*Counsel for the Plaintiff*

*\*Application for Admission Pro Hac Vice*
*Forthcoming*

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| **EFRAIN ROMERO-GARCIA**, as father and statutory next-of-kin of Efrain Romero de la Rosa; | ) ) ) | |
| | ) | Civil Action No.: |
| *Plaintiff,* | ) | 4:20-cv-00158-CDL |
| | ) | |
| v. | ) | **FIRST AMENDED** |
| | ) | **COMPLAINT** |
| **CORECIVIC, INC.,** | ) | |
| | ) | |
| *Defendant,* | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will cause service by electronic mail to all attorneys of record.

This 4th day of December, 2020.

/s/Jeff Filipovits
Jeff Filipovits
Georgia Bar No. 825553

Spears & Filipovits, LLC
1126 Ponce de Leon Ave.
Atlanta, GA 30306
678.237.9302 (direct)
jeff@civil-rights.law