### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF GEORGIA
### COLUMBUS DIVISION

| | | |
|---|---|---|
| **EFRAIN ROMERO-GARCIA**, as father and statutory next-of-kin of Efrain Romero de la Rosa, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Civil Action No.: 4:20-cv-00158-CDL |
| **CORECIVIC, INC.,** | ) ) | |
| *Defendant,* | ) ) | |

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S
### PARTIAL MOTION TO DISMISS AND MOTION TO STRIKE

Plaintiff Efrain Romero-Garcia ("Plaintiff"), by and through his counsel, hereby submits this Opposition to (i) Defendant CoreCivic, Inc.'s ("CoreCivic" or "Defendant") Motion to Dismiss Counts 2 (Torture and Cruel, Inhumane, and Degrading Treatment in violation of the Alien Torts Statute ("ATS")) and Count 3 (Disability Discrimination pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("RA")) of Plaintiff's First Amended Complaint ("FAC") (the "Motion to Dismiss"), and (ii) Defendant's Motion to Strike ("Motion to Strike").[1]  For the reasons set forth below, both Motions should be denied.

### MEMORANDUM AND POINTS OF AUTHORITIES

### I.      FACTUAL BACKGROUND

This is a wrongful death action for compensatory and punitive damages arising out of the preventable suicide inside a solitary confinement cell at the Stewart Detention Center ("Stewart")

---

[1] Citations to Dkt. No. 23 (Defendant's combined Motion to Dismiss Counts 2 and 3 of Plaintiff's First Amended Complaint and Motion to Strike) are together referred to as "MTD p. __".

by Efrain Romero de la Rosa ("Efrain"), a 38 year-old non-citizen immigrant, but longtime U.S. resident, who suffered from acute schizophrenia. FAC at ¶1, 84. Plaintiff brings this action as the father and statutory next of kin of Efrain. *Id.* at ¶2. Stewart is owned and operated by CoreCivic pursuant to an Inter-Governmental Services Agreement ("IGSA") between U.S. Immigration and Customs Enforcement ("ICE"), a sub-component of the Department of Homeland Security ("DHS"), and Stewart County, Georgia. *Id.* at ¶4. Efrain's death was the second preventable death by suicide in less than 15 months at Stewart, following the in-custody suicide of Jeancarlo Alfonso Jiminez Joseph ("Jean") at the same facility just 14 months prior. *Id.* at ¶¶9, 16, 34. Since Jean's death, at least six more detainees have died at Stewart. *Id.* at ¶16 n.2.

Starting at least two months prior to and continuing until his death, Efrain presented with acute psychiatric history and psychotic problems, refused to take his medications, and displayed signs of and made verbal statements of suicidal ideation. *Id.* at ¶¶10, 19-20, 24-26, 28-29. He was also transferred by Stewart to Columbia Regional Care Center for inpatient mental health treatment due to his post-solitary confinement acute mental health decompensation at Stewart. *Id.* at ¶¶21-22. Upon his return to Stewart on June 12, 2018, he was placed back in solitary, returned to general population on June 14, but then promptly placed back in solitary as punishment for behavioral consequences of his (then un-medicated) schizophrenia. *Id.* at ¶¶23, 25. On June 21, 2018, CoreCivic official L. Gainer sentenced Efrain to 30 days in solitary confinement, where he stayed until his death on July 10, 2018. *Id.* at ¶27-28. The day Efrain took his life, he told a guard about his plan to kill himself, and instead of taking action, the guard mocked Efrain. *Id.* at ¶29-30. Contrary to all policies, contractual requirements, and human decency, and the benefit of hindsight, CoreCivic took none of the actions required when an inmate presents with suicidal ideations, and instead punished Efrain with the one thing that could make his suicidal ideation worse—largely

2

unsupervised solitary confinement. *Id.* ¶¶10-18, 30-37. Efrain's death carries inexcusable culpability, as CoreCivic had the benefitted of hindsight—it knew which of its operations had failed to save Jean's life, and chose to ignore and not address those failures to save costs. *Id.* ¶¶16-18, 34-37. Moreover, upon discovery of Efrain's lifeless body, CoreCivic's serial shortchanging of basic necessities deprived Efrain of any chance of survival: the oxygen tank was broken, the defibrillator did not work, and it took five minutes before anyone even bothered to call 911. *Id.* at ¶¶ 38-43. Efrain did not have to die. *Id.* ¶ 43.

## ARGUMENT

## II.   DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED

### A.   STANDARD OF REVIEW FOR A MOTION TO DISMISS

To survive a Rule 12(b)(6) motion, Plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Renfroe v. Nationstar Mortg.*, LLC, 822 F.3d 1241, 1243 (11th Cir. 2016). "[A] court reviewing such a motion should bear in mind that it is testing the sufficiency of the pleading and not the merits of the case." *Polsinelli PC v. Genesis Biosciences, Inc.*, No. 1:14-CV00873, 2015 WL 12850574, at *2 (N.D. Ga. May 22, 2015) (citing *Twombly*, 550 U.S. at 556). In ruling upon a motion to dismiss, the Court accepts the well plead factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Hill v. White*, 321 F.3d 1334, 13335 (11th Cir. 2003). The FAC's detailed allegations exceed that standard, and the Motion to Dismiss should be denied.[2]

---

[2] Defendant has not moved to dismiss Plaintiff's claim for Wrongful Death (Count 1).

3

**B.    THE FAC STATES A CLAIM AGAINST DEFENDANT CORECIVIC FOR VIOLATING THE ALIEN TORTS STATUTE (COUNT 2)**

CoreCivic's attempt to dismiss Plaintiff's claim under the ATS fails because the FAC plausibly pleads all elements of an ATS claim. CoreCivic first suggests that Plaintiff cannot recover for the torture of his son, Efrain, at CoreCivic's immigration detention center because the Complaint lacks an expressly pleaded allegation that the decedent was an "alien." MTD p. 3 n.1. Defendant is wrong. The Immigration and Nationality Act (INA) defines an "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). Under the INA, the term "immigrant" refers to "every alien" except those carved out by Congress. 8 U.S.C. § 1101(a)(15). The FAC describes a "fellow immigrant" of Efrain's at Stewart. FAC at ¶29. The FAC also defines Efrain himself as an "immigrant" and alleges 8 U.S.C. § 1229, which sets forth the rights of "noncitizens"—*i.e.*, 'aliens'—in removal proceedings. FAC at ¶84. People who are not "aliens" as defined by the INA cannot have their "claims for relief" "adjudicate[ed]" by the Executive Office for Immigration Review, as alleged in Paragraph 84 of the FAC, because federal immigration courts have no jurisdiction over U.S. Citizens. *See Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) ("Jurisdiction in the executive to order deportation exists only if the person arrested is an alien. The claim of citizenship is thus a denial of an essential jurisdictional fact."); *cf. Lyttle v. United States*, 867 F. Supp. 2d 1256, 1267 n.1 (M.D. Ga. 2012) ("It is undisputed that Lyttle[,]" a former Stewart Detention Center detainee, "is a U.S. citizen."). Taking all well-pleaded allegations in the FAC as true and drawing all permissible inferences in Plaintiff's favor, Plaintiff has pleaded that Efrain was an "alien" and may thus allege a claim pursuant to the ATS.

Because CoreCivic's remaining attacks of Plaintiff's ATS claim likewise ignore the well-pleaded allegations of the FAC, they fails as well. *See* MTD pp. 4-8. For starters, CoreCivic is simply incorrect about the substance of Plaintiff's solitary confinement allegations. Take, for

instance, what CoreCivic would have this Court read as a "generalized allegation" that it placed Efrain in solitary "as punishment for an infraction of the facility's disciplinary code, which infraction stemmed from behaviors associated with Efrain's mental health condition." MTD at 8 (citing FAC at ¶62). In fact, Plaintiff alleges "CoreCivic ignored . . . contractually binding federal performance-based detention standards by placing and keeping the victims in solitary confinement as punishment for displaying behaviors associated with their diagnosed mental health conditions."[3] FAC ¶14; *cf.* MTD at 5 ("[Plaintiff] does not allege that the disciplinary sanction was unlawful."). The FAC alleges that CoreCivic knew of Efrain's prior acute decompensation in solitary, that Efrain specifically warned CoreCivic staff he intended to end his life in solitary, and that these officials failed to act. *See, e.g.*, FAC ¶¶10-14, 21-22, 24-32. Because the well-pleaded allegations

---

[3] Though CoreCivic cites to the Performance-Based National Detention Standards ("PBNDS") as a shield from Plaintiff's ATS allegations and asks the Court to take judicial notice of the Standards (*see* MTD p. 7), CoreCivic fails to inform the Court that ICE—CoreCivic's contracting partner— concluded in October 2018 that "CoreCivic's 'gross negligence' and 'egregious and non- compliant' infractions of [these] detention standards led to Mr. de la Rosa's death." As a cursory review of PBNDS Sections 3.1 and 4.6 will reveal, Plaintiff's allegations that CoreCivic punished Efrain with solitary confinement for behavior arising out of his mental health condition is in substance an allegation that CoreCivic broke these rules. Referring to the death of Jean Jimenez at Stewart, *see Chaverra v. United States of America*, No. 4:19-cv-81-CDL (M.D. Ga.), the report continues: "The two deaths display alarming similarities: both detainees were placed in solitary confinement despite having serious mental illnesses, neither receive recommended mental healthcare, and in both incidents, officers failed to properly monitor their cells, falsified observation logs, and bungled the emergency response." *See* Staff Report from the U.S. House of Representatives Committee on Government Oversight and Reform and Subcommittee on Civil Rights and Civil Liberties, "The Trump Administration's Mistreatment of Detained Immigrants: Deaths and Deficient Care by For-Profit Detention Contractors" at 24 (Sept. 2020), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-09- 24.%20Staff%20Report%20on%20ICE%20Contractors.pdf (last visited Feb. 1, 2021). The Court may take judicial notice of this government document pursuant to Federal Rule of Evidence 201. *See Acella Pharms., LLC v. First DataBank, Inc.*, No. 1:17-CV-5013-MHC, 2018 WL 7199992, at *6 (N.D. Ga. June 4, 2018), *order vacated on other grounds*, No. 1:17-CV-5013-MHC, 2018 WL 7199807 (N.D. Ga. Oct. 4, 2019).

of the FAC allege CoreCivic violated its binding standards in placing Efrain into solitary confinement, the claims may proceed under the ATS.

CoreCivic next contends that Plaintiff cannot recover under the ATS because he failed to allege sufficient instigation or acquiescence by a public official. MTD p. 5. Defendant's contention is incorrect. The FAC alleges that CoreCivic owns and operates Stewart "pursuant to a pass-through [IGSA] between [ICE] and Stewart County, Georgia" and that CoreCivic ignored, among other things, the PBNDS which are contractually-binding federal standards. *Id.* at ¶4, 14. The FAC further alleges that prior to Efrain's death, the DHS's Office of Inspector General informed CoreCivic of the deadly risks its unremediated violations of these federal standards would pose to individuals like Efrain. *Id.* at ¶18. The FAC also specifically references CoreCivic's contract with ICE in discussing the requirements governing CoreCivic's punishment of Efrain by solitary confinement (*id.* at ¶27), and alleges that had CoreCivic complied with these federal standards, including the ATS (which it did not), Efrain's injuries and death may have been prevented. *Id.* at ¶44. Viewed in a light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, the FAC alleges CoreCivic, operating under a government contract and using that authority to misapply federally-devised disciplinary sanctions, put Efrain into solitary confinement with the consent or acquiescence of a public official. Taken together, these allegations are sufficient to plausibly infer knowledge or acquiescence by ICE officials in CoreCivic's acts and omissions.

The remainder of CoreCivic's challenges to Plaintiff's ATS claim also fail because CoreCivic simply ignores Plaintiff's well-pleaded allegations. With respect to acts with the "gravity" to constitute torture (*see* MTD p. 6), Plaintiff alleges CoreCivic's torture and cruel, inhuman and degrading treatment ("CIDT") ended Efrain's life. FAC ¶70. The FAC alleges

CoreCivic officials knew this was the risk of punishing Efrain for behavioral violations arising out of his mental health condition, but punished him with solitary confinement anyway. *See, e.g.,* FAC ¶¶62-69. Moreover, CoreCivic relies on dicta from *Jama v. U.S.I.N.S.*, 343 F. Supp. 2d 338, 360 (D.N.J. 2004) in a misplaced attempt to argue that even if Plaintiff establishes specific and international norms that give rise to a cause of action under the ATS (which Plaintiff has done, *see* FAC ¶¶52-60), this Court should still dismiss Plaintiff's ATS claim because "[a]ny prison in which an alien was included among the inmates[/detainees] would face an AT[S] [case], even though the inmates[/detainees] would have available claims under 42 U.S.C. § 1983 or *Bivens*." *See* MTD p. 7 (quoting *Jama v. U.S.I.N.S.*, 343 F. Supp. 2d at 361). CoreCivic's reliance on *Jama's* dicta is misleading. In *Jama*, the Court in fact goes on to explain how, despite this caution, the plaintiffs therein

> alleged gross mistreatment, not of criminals or persons accused of crime, but rather of persons who have committed no crime but are awaiting a decision on their application for asylum. The law of nations as evidenced in the various conventions, treaties, declarations and other sources cited by the *Jama* plaintiffs can be said to have reached a consensus that inhuman treatment of a huge number of persons accused of no crime and held in confinement is a violation of the law of nations.

*Jama*, 343 F. Supp. 2d at 361. The *Jama* plaintiffs, like Plaintiff here, similarly relied upon, among other things, the Convention Against Torture and CIDT. *Id.* at 360; *see* FAC ¶¶52-60. The *Jama* court goes on to further explain that both §1983 and *Bivens* claims were not available to the plaintiffs, as no state action was involved and all but one of the plaintiffs are "excludable" aliens for purposes of *Bivens*, and thus plaintiffs could establish an ATS claim against defendants, a privately-owned detention facility and its officers. *Id.* at 361. Similarly here, Plaintiff brings his

claims against CoreCivic, a private actor, and Efrain is likely a "removable"[4] alien, thus both §1983 and *Bivens* claims are similarly not available.  CoreCivic's argument thus boils down to a rhetorical claim—not a legal one.  Plaintiff has adequately plead harm rising to the level of torture and CIDT.  For the foregoing reasons, CoreCivic's motion to dismiss Plaintiff's claim under the ATS (Count 2) should be rejected.

### C.    THE FAC STATES A CLAIM AGAINST DEFENDANT CORECIVIC FOR VIOLATION THE REHABILITATION ACT (COUNT 3)

A prima facie case of discrimination in violation of Section 504 of the RA, 29 U.S.C. §794, requires a plaintiff to show (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a program; (3) the program receives federal financial assistance, and (4) the program discriminates against plaintiff.  *See, e.g., Arline v. School Bd. Of Nassau Cnty.*, 772 F.2d 759, 760 (11th Cir. 1985); *Atchison v. Bd. Of Regents of the Univ. Sys. Of Ga.*, 1:13-CV-02922-TCB, 2014 WL 12013430, *5 (N.D. Ga. Nov. 13, 2014).  The Eleventh Circuit "has concluded that section 504 creates a private cause of action."  *Arline v. School Bd. Of Nassau Cnty.*, 772 F.2d at 760 n.1 (citing *Jones v. Metropolitan Atlanta Rapid Transit Auth.*, 681 F.2d 1376, 1377 n.1 (11th Cir. 1982), *cert. den'd*, 465 U.S. 1099 (1984)).  Here, the FAC sufficiently alleges facts to survive a motion to dismiss on Count 3.  FAC at ¶¶4, 44, 73-91.  CoreCivic contests only the third element, arguing that it does not receive federal financial assistance.  *See* MTD pp. 8-11.

---

[4] *See* ICE Detainee Death Report: De la Rosa, Efrain Romero, *available at* https://www.ice.gov/doclib/foia/reports/ddrDeLaRosaEfrainRomero.pdf (last accessed Feb. 1, 2021).  The Court may also take judicial notice of this government document pursuant Federal Rule of Evidence 201.  *See Acella Pharms., LLC*, 2018 WL 7199992 at *6.  In 1996, Congress substituted the term "removal" for the legacy term "exclusion" to reference such proceedings.  *See Vartelas v. Holder*, 566 U.S. 257, 261-262 (2012).

Congress did not define the term "federal financial assistance" in the RA, but federal courts, including the Eleventh Circuit, have defined this term "to mean the federal government's provision of a subsidy to an entity." *Shotz v. American Airlines, Inc.*, 420 F.3d 1332, 1335 (11th Cir. 2005) (citing *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir.1990) (finding that a defendant receives "federal financial assistance" within meaning of Rehabilitation Act when it receives a subsidy) (citing *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1208–09 (9th Cir.1984)); *Bachman v. Am. Soc.'y of Clinical Pathologists*, 577 F. Supp. 1257, 1264 (D.N.J.1983) ("The term 'assistance' connotes a transfer of government funds by way of subsidy.")).

The question of whether Defendants received federal financial assistance is a fact-intensive inquiry inappropriate for resolution on a motion to dismiss. *PAS Commc'ns, Inc. v. U.S. Sprint, Inc.*, 112 F. Supp. 2d 1106, 1111 (D. Kan. 2000). The "vast majority of courts faced with the issue of whether an entity receives federal financial assistance within the meaning of the civil rights law have concluded that the resolution of the issue ***requires inquiry into factual matters outside the complaint*** and, accordingly, ***is a matter better suited for resolution after both sides have conducted discovery on the issue.***" *Id.* (emphasis added) (noting supporting cases: *Shepherd v. U.S. Olympic Committee*, 94 F. Supp. 2d 1136, 1146-47 (D. Colo. 2000); *Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 26 F. Supp. 2d 1001, 1008 (W.D. Mich. 1998); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460, 492 (D.N.J. 1998); *Gazouski v. City of Belvidere*, No. 93-C-20157, 1993 WL 515858, at *3 (N.D. Ill. Dec. 13, 1993); *Gonzalez v. Dev. Assistance Corp.*, No. 88-0191-LFO, 1989 WL 205634, at *3 (D.D.C. June 21, 1989); *Bellamy v. Roadway Express, Inc.*, 668 F. Supp. 615, 618 (N.D. Ohio 1987); *Squire v. United Airlines, Inc.*, 973 F. Supp. 1004, 1009 (D. Colo. 1997)). A particularized record on federal funding is especially important in

Section 504 cases that involve *private* entities, as in this action, because Section 504's coverage is *program-specific* with respect to a private entity that "receives federal funds for a specific and limited purpose." *Boswell v. Skywest Airlines, Inc.*, 217 F. Supp. 2d 1212, 1216 (D. Utah 2002); *see* 29 U.S.C. § 794(b)(3)(B). Thus, whether CoreCivic received federal financial assistance is a fact-intensive question that is inappropriate for resolution on a motion to dismiss.

CoreCivic contends that because it is paid by the federal government per an IGSA, which it alleges is a federal procurement contract and not a subsidy, it does not receive "federal financial assistance." *See* MTD pp. 8-11. CoreCivic also contends that monies it receives from the federal government to operate a Voluntary Work Program for detainees at Stewart also do not qualify as "federal financial assistance," as CoreCivic is obligated to run this program as "a term" of its IGSA with ICE in order to comply with ICE's Performance-Based National Detention Standards ("PBNDS"). *Id.* at 11. Defendant is wrong.

This argument is a gross oversimplification of how courts determine what constitutes "federal financial assistance." The Eleventh Circuit has adopted a "government intention" test to assess whether the government "'intended to give [the defendant] a subsidy,' as opposed to compensation." *Shotz*, 420 F.3d at 1335 (quoting *DeVargas*, 911 F.2d at 1382; citing *Delmonte v. Dept. of Bus. and Prof'l Reg.*, 877 F.Supp. 1563, 1565 (S.D. Fla. 1995)). In articulating this test, the Eleventh Circuit in *Shotz* relies on the Tenth Circuit's decision in *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377 (10th Cir.1990), which in turn relies upon the Ninth Circuit's decision in *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202 (9th Cir.1984), which instructs:

> [I]n determining which programs are subject to the civil rights laws . . . Courts should determine whether the government intended to provide assistance or merely to compensate. The relevant intention is that of Congress or that of the

administrative agency to which Congress has delegated the power to determine whether assistance should be provided.

*Id.* at 1210.  In determining governmental intent, courts refer "to the statutory authority for the particular disbursements at issue," including legislative history, "relevant administrative documents," regulations, and other sources. *Id.* at 1210, 1213-15; *see, e.g.*, *U.S. Dept. of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597, 604 (1986) (reviewing "underlying grant statutes" to determine if airlines received federal assistance); *DeVargas*, 911 F.2d at 1382 (weighing agency study and competitive bidding process for government contracts).

The FAC sufficiently pleads facts that support a finding that CoreCivic received federal financial assistance from ICE, or alternatively, pleads sufficient facts to warrant discovery on this issue.  Initially, the FAC alleges that CoreCivic received additional federal subsidies (*i.e., in addition to* monies collected by CoreCivic pursuant to its IGSA with DHS/ICE) for its Voluntary Work Program.  FAC ¶¶74-75.  As stated in the FAC, the Voluntary Work Program "authorizes CoreCivic to use detainees to perform essential work at wages far, far below market rates, work that CoreCivic would otherwise be required to carry out with additional staff hired from the community at market rates, thus providing CoreCivic a significant financial benefits" and "the United States provides CoreCivic a stipend of $1 per day for each detainee who participates in the Voluntary Work Program." FAC at ¶75.  As the subsidies related to this program confer significant financial benefits to CoreCivic that are *in addition to* payments it recovers under its IGSA, they are unquestionably considered, especially at the pleadings stage, "federal financial assistance."

Plaintiff further alleges that CoreCivic "owned and operated [Stewart] pursuant to a pass through [IGSA] between [ICE] and Stewart County, Georgia[,]" and that CoreCivic receives "federal financial assistance."  FAC at ¶¶4, 74; *see PAS Commc'ns*, 112 F. Supp. 2d at 1111 (complaint's allegation "that defendant receives 'federal financial assistance subject to institution-

wide coverage'" sufficiently stated a claim under Title VI of the Civil Rights Act of 1964, which uses "federal financial assistance" in an analogous context to Section 504).  The FAC alleges that Defendants' contracted activities were subject to agency directives that evidence DHS's intent to hold Defendants accountable to the RA's standards, a claim Defendants do not dispute.  FAC at ¶¶76-79; MTD p. 8 (noting DHS, "which houses [ICE], followed this directive by promulgating regulations which prohibit disability . . . among its contractors."); *see Moreno v. Consol. Rail Corp.,* 99 F.3d 782, 787 (6th Cir. 1996) (provision in defendant railroad's "master agreement" with state highway commission for federal funding, in which defendant "promise[d] to comply with the nondiscrimination regulations for federally assisted programs," supported holding that defendant received federal financial assistance).   For instance, DHS's *Instruction on Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment),*[5] discussed in the FAC (*see* FAC ¶79), implements federal disability rights laws, including the RA, and defines the agency's "conducted programs and activities" to "*include[e] those carried out through contractual or licensing agreements.*"[6]

---

[5] DEP'T OF HOMELAND SECURITY, INSTRUCTION NO. 065-01-001: INSTRUCTION ON NONDISCRIMINATION FOR INDIVIDUALS WITH DISABILITIES IN DHS-CONDUCTED PROGRAMS AND ACTIVITIES          (NON-EMPLOYMENT),          *available          at* https://www.dhs.gov/sites/default/files/publications/dhs-instruction-nondiscrimination-individuals-disabilities_03-07-15.pdf (last visited Feb. 2, 2021); *see also* DEP'T OF HOMELAND SECURITY, DIRECTIVE NO. 065-01: NONDISCRIMINATION FOR INDIVIDUALS WITH DISABILITIES IN DHS-CONDUCTED PROGRAMS AND ACTIVITIES (NON-EMPLOYMENT) (2013) (the DHS Directive implemented          by          the          foregoing          Instruction),          *available          at* https://www.dhs.gov/sites/default/files/publications/dhs-management-directive-disability-access_0_0.pdf (last visited Feb. 2, 2021).

[6] INSTRUCTION NO. 065-01-001, *supra* note 2, at § IV.D (emphasis added); *see also id.* at § IV.F (defining "facility" as "[a]ll or any portion of a building, structure, equipment, road, walk, parking lot, rolling stock (e.g., buses, vans, cars, railcars, or other conveyances), or other real or personal property that owned, leased, or used by DHS or its contractors".).

Additionally, in its Answer to Paragraph 4 of the FAC, "admits that it owns [Stewart] . . . and at all relevant times operated it as a service provider to Stewart County, Georgia, in accordance with the [IGSA] between [ICE] and Stewart County, Georgia." Dkt. No. 24 at ¶4.  Standard 4.8 of ICE's 2011 PBNDS ("Disability Identification, Assessment, and Accommodation")[7] affirms that the standard applies to IGSA facilities, as well as Contract Detention Facilities ("CDFs"),[8] and requires such facilities to, *inter alia*, "comply with Section 504 of the Rehabilitation Act of 1973."[9]  *See* FAC at ¶¶75-79, 83-87 (alleging that 2011 PBNDS, among other agency directives, governed Defendants' activities).  Imposition of Section 504 liability on IGSA facilities and CDFs is consistent with *Paralyzed Veterans'* stated rationale for Section 504 coverage as being "a form of contractual cost of the recipient's agreement to accept the federal funds," and supports the conclusion that DHS and ICE intended to provide Defendants federal financial assistance. 477 U.S. at 605.

Contrary to Defendant's assertions, the IGSAs are not considered "procurement contracts" by the federal government.  MTD p. 11.  The statutory authority for the Secretary of Homeland Security[10] to enter into IGSAs like the one at issue here lies in 8 U.S.C. § 1103(a)(11).  *See also* 8 U.S.C. § 1231(g) (providing the Secretary power to "arrange for appropriate places of detention for [non-citizens] detained pending removal or a decision on removal").  Subsection (A) of §

---

[7] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, PERFORMANCE-BASED NATIONAL DETENTION STANDARDS 2011, *available at* https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf (last visited Feb. 1, 2021).

[8] *Id.* at § 4.8.I, p. 344.

[9] *Id.* at § 4.8.II, p. 344.

[10] While 8 U.S.C. § 1103(a)(11) refers to the Attorney General, the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, transferred the Attorney General's duties and "the functions of the Immigration and Naturalization Service to the [DHS]." Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68. Fed. Reg. 9824, 9824 (Feb. 28, 2003). *Clark v. Martinez*, 543 U.S. 371, 375 n.1 (2005).

1103(a)(11) authorizes DHS "to make payments . . . for necessary clothing, medical care, necessary guard hire, and the housing, care, and security" of immigration detainees "under an agreement with a State or political subdivision" thereof. 8 U.S.C. § 1103(a)(11)(A). Subsection (B) empowers DHS "to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services . . . ." 8 U.S.C. § 1103(a)(11)(B). These "cooperative agreements" sound less in terms of procurement than subsidy. *See* 31 U.S.C. § 6305 ("Using cooperative agreements"); 2 C.F.R. § 200.24 ("Cooperative agreement means a legal instrument of *financial assistance* between a Federal awarding agency or pass-through entity and a non-Federal entity . . .") (emphasis added). Moreover, assuming some portion of the federal funds that CoreCivic receives from ICE are used to *improve* property CoreCivic owns (*see* Answer, Dkt. No. 24 at ¶4), the funds were intended as financial assistance that go beyond mere compensation and would bring Defendants within Section 504. *See Moreno*, 99 F.3d at 788. And, to the extent that compensation is defined as payment for services rendered, *see Jacobson*, 742 F.2d at 1209, ICE provides CoreCivic a subsidy if their contract includes a local detention bed minimum, by which the agency would in fact be paying for services *not rendered* in order to ensure available beds when and if the agency needs them.

      CoreCivic relies on *Matter of: Red River Waste Solutions, Inc.*, No. B-414367, 2017 WL 1075155 (Comp. Gen. Mar. 21, 2017) ("*Red River*"), an agency decision by the U.S. Government Accountability Office ("GOA"), which notes that "'an IGSA is not a procurement contract' subject to the provisions of the Competition in Contracting Act of 1984 (CICA)." *Id.* at *2; MTD at p. 11. *Red River* is distinguishable from the instant case as it concerns IGSAs brokered by the U.S. Army and U.S. Department of Defense in the context of determining whether the CICA applies (not

14

Section 504), and which are distinct from IGSAs provided from DHS and ICE pursuant to 8 U.S.C.

§ 1103(a)(11)(A). *Red River*, 2017 WL 1075155 at *2. Moreover, *Red River* cites two additional

GOA decisions which held that "cooperative agreements" are not procurement contracts. *Id.* at *3

(citing *Exploration Partners, LLC*, No. B–298804, 2006 WL 3734150, *3 (Comp. Gen. Dec. 19,

2006) (finding that "other transaction" agreements, cooperative agreements, and other non-

procurement instruments are not procurement contracts); *Strong Envtl., Inc.*, No. B–311005, 2008

WL 649591 at *3 (Comp. Gen. Mar. 10, 2008) (holding agreement at issue was a "cooperative

agreement" and not a "procurement contract"). This fact is noteworthy as CoreCivic's Motion to

Dismiss defines an IGSA as "[a] cooperative agreement." MTD p. 10.

Also, the FAC *nowhere* alleges that any contracts were procurement contracts. *See

generally* FAC. Defendant cite the Section 504 implementing regulation issued by the Department

of Health and Human Services that interprets federal financial assistance as excluding procurement

contracts (MTD p. 10), but Defendant ignores that this provision, 45 C.F.R. § 84.3(h), *includes*

"any grant, loan, *contract*, ... or any other arrangement by which the Department provides or

otherwise makes available assistance[.]" *Id.* (emphasis added).[11] CoreCivic's characterization of

its IGSA with ICE as a procurement contracts thus improperly relies on facts outside of the

pleadings and should be rejected.

Given that CoreCivic is a private entity which received federal funding for specific

purposes, discovery of at least the contracts at issue, as well as information concerning the contract

---

[11] The equivalent implementing regulation by the DHS—the executive agency providing Defendants federal funding here—nowhere defines federal financial assistance. 6 C.F.R. § 15.3; *cf., e.g., DeVargas*, 911 F.2d at 1383 (citing 10 C.F.R. § 1040.2(b)(3)) (underscoring Department of Energy regulation excluding procurement contracts from Section 504 coverage); *Cook v. Budget Rent-A-Car Corp.*, 502 F. Supp. 494, 497 n.5 (S.D.N.Y. 1980) (citing regulations from six agencies that define federal financial assistance to exclude procurement contracts).

bidding, negotiation, monitoring, and inspection processes, is necessary to determine whether CoreCivic received federal financial assistance under Section 504. *See, e.g., Marks v. Colo. Dep't of Corr.*, 976 F.3d 1087, 1092 (10th Cir. 2020) (looking at term in community corrections program contract between county and state agency that bound the former's subcontractors to agency's standards); *Moreno*, 99 F.3d at 785-86 (reviewing defendant railroad's contract with state highway department and observing that the district court even heard testimony from a former state official with regard to the financial assistance issue); *DeVargas*, 911 F.2d at 1382 (giving weight to contract's bidding process in determining federal financial assistance issue); *Mullen v. S. Denver Rehab., LLC*, No. 18-cv-01552-MEH, 2020 WL 2557501, at *26 (D. Colo. May 20, 2020) (engaging in detailed analysis of defendant's management contract to determine whether it received federal financial assistance); *Tanberg v. Weld Cty. Sheriff*, 787 F. Supp. 970, 974 (D. Colo. 1992) (holding as a matter of law that sheriff's department received federal financial assistance after reviewing its annual financial reports). The FAC sufficiently pleads claims to warrant such discovery. For these reasons, CoreCivic's Motion to Dismiss as to Count 3 should be denied.

## III.   DEFENDANT'S MOTION TO STRIKE IS IMPROPER AND SHOULD BE DENIED

"Rule 12(f) permits a court to 'strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Dunn v. Smith & Sons Foods, Inc.*, No. 5:19-cv-00502-TES, 2020 WL 556401, *1 (M.D. Ga. Feb. 4, 2020) (quoting Fed. R. Civ. P. 12(f)). "Motions to strike are disfavored and viewed as 'a drastic remedy to be resorted to only when required for the purposes of justice.'" *Courtesy Properties, LLC v. S&ME, Inc.*, No. 1:20-cv-02097-SDG, 2020 WL 7698659, *10 (N.D. Ga. Dec. 28, 2020) (quoting *TracFone Wireless, Inc.*

*v. Zip Wireless Prod., Inc.*, 716 F. Supp. 2d 1275, 1290 (N.D. Ga. 2010)).  No such purpose exists here, and the Motion to Strike should be denied.

Defendant's motion seeks to strike Footnote 2 of the FAC.  *See* MTD pp. 12-13.  Footnote 2 expounds on the gravity of the situation at Stewart, despite clear awareness that systemic failures at the facility were putting detainees at an increased risk of harm.  Specifically, Footnote 2 of the FAC states in full:

> Since Jean's death, at least six more men have died at Stewart: Yulio Castro Garrido, Efrain Romero de law Rosa, Pedro Arriago-Santoya, Santiago Baten-Oxlaj, Jose Guillen-Vega, and Cirpriano Chavez-Alvarez, making it among the deadliest ICE detention facilities in the United States.

FAC at ¶16 n.2.  Defendant has provided no valid basis for striking these allegations from the FAC, other than its threadbare assertion that the footnote is "immaterial, impertinent, and scandalous."  MTD at 12-13.  As the case law from this Court makes clear—case law that Defendant ignores—this argument is nothing more than an effort to dispute factual assertions in the FAC, and is not a valid reason for striking allegations from a complaint.

"Motions to strike cannot be used to determine disputed fact questions, nor can they be used to decide disputed substantial questions of law, particularly where there is no showing of prejudice to the movant."  *Dunn*, 2020 WL 556401, *2 (citing and quoting *Brown v. Joiner Int'l, Inc.*, 523 F. Supp. 333, 336 (S.D. Ga. 1981)) (internal quotation marks omitted).  In *Dunn*, this Court denied a motion to strike five paragraphs of a complaint that discussed a witness's pre-litigation written statement about the sexual harassment incurred by Plaintiff, which written statement was also attached to the complaint, where that witness later disavowed the contents of that statement.  *Id.* at *1.  In denying the motion to strike, this Court explained that the paragraphs in the complaint discussing the written statement and the written statement itself "are not so immaterial that they have no possible bearing on the issues potentially presented in forthcoming

17

dispositive motions or at trial" and do not prejudice the Defendant. *Id.* at *1-2 (citing *United States v. S. Motor Carriers Rate Conference*, 439 F. Supp. 29, 39 (N.D. Ga. 1977)). The Court further explained the importance of accepting the complaint's factual allegations as true at the pleading stage, leaving inquiry into their veracity as a task for discovery, stating:

> Under *Iqbal* and *Twombly* the Court must accept the allegations contained in the five paragraphs at issue as true and, to the extent they are in fact false, it is incumbent on [Defendant] to debunk those allegations through its findings in discovery. Through this lens, [Defendant's Motion to Strike] is, for all intents and purposes, nothing more than an attempt to close a potential avenue of proof for Plaintiff's claims and test the evidentiary sufficiency of the facts asserted in his Complaint. Such actions are inappropriate under Rule 12(f).

*Dunn*, 2020 WL 556401 at *2 (citing *Brown*, 523 F. Supp. at 336).

Here, the death of six other immigrant detainees at Stewart since the death of Jean just 14 months prior to Efrain's death is both "essential" and "important" to Plaintiff's allegations in the FAC. *See* MTD p. 12 (quoting *In Fantasy, Inc, v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994)). The FAC asserts a count for wrongful death, which claim encompasses the allegation that CoreCivic acted negligently and with negligence per se, and which requires a showing of foreseeability. *See* FAC at ¶¶46-72. That there were numerous other deaths of immigrant detainees at the exact same CoreCivic-owned and operated facility in or around the same general time frame as Efrain's death, as referenced in Footnote 2, is highly relevant and important to the issue of whether Efrain's death was foreseeable to CoreCivic. *See, e.g.*, FAC at ¶¶16, 17, 36, 50. Moreover, Plaintiff does not agree with Defendant's claim that these other detainees died of "natural causes"—just because Defendant proffers it in its brief does not make it so. *See* MTD p. 13. Further, this contention is beside the point, as the materials Defendant cites in support of this contention are outside the four corners of the FAC and should be disregarded altogether, as they do not paint an accurate picture of the information Defendant attempts to portray

18

to this Court.  And the fact that these other detainees allegedly died of causes other than suicide[12]

does not diminish their relevancy and materiality, as the specific factual circumstances of these

other deaths is a question that is more appropriately resolved following discovery.  *Dunn*, 2020

WL 556401 at *2 ("Under *Iqbal* and *Twombly* the Court must accept the allegations contained in

the five paragraphs as true and, to the extent they are in fact false, it is incumbent on [Defendant]

to debunk those allegations through its findings in discovery."); *see also Ricci v. Destefano*, No.

3:04 CV 1109 JBA, 2006 WL 2666081 at *2 (D. Conn. Sept. 15, 2006) (motions to strike are not

the proper vehicle for determining the admissibility of evidence).  Defendant's Motion to Strike is

simply "an attempt to close a potential avenue of proof for Plaintiff's claims and test the

evidentiary sufficiency of the facts asserted in his Complaint" and thus is "inappropriate under

Rule 12(f)."  *Dunn*, 2020 WL 556401 at *2.

The case law relied upon by Defendant is also inapposite.  In *Zdenek v. School Board of*

*Broward County*, No. 07-61110-CIV, 2007 WL 4521489 (S.D. Fla. Dec. 19,  2007), the Southern

District of Florida denied Defendant's motion to strike factual allegations in a complaint related

to plaintiff's sexual assault by her employer.  *Id.* at *1; *see* MTD p. 12.  The court noted that, even

though the allegations were more detailed than required under notice pleading standards, they were

appropriate considering the Eleventh Circuit's "standards on what constitutes actionable sexual

harassment" and thus did not meet Rule 12(f)'s standard to strike.  *Zdenek*, 2007 WL 4521489 at

*1-2.  The Court, however, agreed to strike a sentence about the effect of the discrimination on

plaintiff's son, noting that the son is not a party to the action.  *Id.* at *2.  In *Fantasy, Inc.* the Ninth

Circuit agreed to strike portions of a complaint that related to a claim that was barred by both the

---

[12] *See generally Fraihat v. U.S. Immigration and Customs Enforcement*, 445 F.Supp.3d 709 (C.D. Cal. 2020) (allegations that Stewart, among other detention facilities, "failed to ensure minimum lawful conditions of confinement").

statute of limitations and *res judicata*.  984 F.2d at 1528; *see* MTD p. 12.  Lastly, in *Momentum Marketing Sales & Services, Inc. v. Curves Int'l , Inc.*, W-07-CA-048, 2008 WL 11334568, \*1 (W.D. Tex. June 25, 2008), the Western District of Texas struck language in a complaint that was immaterial, finding it had no connection to the issues in the case, and struck other language as "scandalous," including statements that a defendant "abandoned his religious principles" which the court similarly found had "no possible relation to the controversy," and allegations characterizing a defendant's relationship with another individual as his "drinking buddy" as similarly having no bearing on the case and that would "only be interpreted as unfairly prejudicial." *Id.* at \*1-2; *see* MTD at p. 12.  To the contrary, here Footnote 2 is highly relevant and material to the issue of the foreseeability of Efrain's death.

Defendant also has not stated how they are prejudiced by Footnote 2, nor could they.  *See Dunn*, 2020 WL 556401 at \*2 ("a denial of this Motion [to Strike] presents no prejudice to [Defendant]").  If Defendant is unhappy with the manner in which the FAC characterizes Stewart in light of the fact that at least seven human beings lost their lives there while in Defendant's custody, including the completely foreseeable and preventable death of Efrain, perhaps Defendant should expend that energy trying to fix the problems at Stewart rather than filing frivolous motions to strike.  For these reasons, Defendant's Motion to Strike should be denied.

## IV.   CONCLUSION

For all of the foregoing reasons, Defendant's Motion to Dismiss and Motion to Strike should be denied.  To the extent the Court finds any deficiencies in the pleadings, Plaintiff respectively seeks leave to amend the FAC in order to address any such deficiencies.

Dated:  February 1, 2021

Respectfully submitted,

/s/
Shirley C. Zambrano, Esq.
Zambrano & Ruiz, LLC

1995 North Park Place, Suite 240
Atlanta, GA 30339
Tel. 770-769-5821
Fax: 770-769-5810
szambrano@zambranoandruiz.com

R. Andrew Free, Esq.*
P.O. Box 90568
Nashville, TN 37209
Tel. 844-321-3221
Fax: 615-829-8959
Andrew@immigrantcivilrights.com
Counsel for the Plaintiff
*Application for Admission Pro Hac Vice
Forthcoming

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY THAT on February 1, 2021, I filed the foregoing electronically

through the CM/ECF system, which caused all Defendants' counsel to be served by electronic

means, as more fully reflected on the Notice of Electronic Filing.

/s/
Shirley C. Zambrano, Esq.